Good morning and welcome. The only case we're hearing today is Wilson v. USI Insurance Services et al. The first case docket number is 20-3124, and I'm not going to read the other ones because there are quite a few. So let me ask, are there any requests for rebuttal time from the appellants? James Martin, your honor, one minute, please. Okay, that'll be granted. Anybody else? Walter Andrews, your honor, three minutes, please. Okay. Anybody else? A final rule, 30 seconds. That's denied. That's too short. We really can't get anything done in 30 seconds, so thank you. Okay. It's time to sneeze. All righty. So we'll hear from the, I guess, Mr. Perrucci's first. Okay. Good morning, your honors. Good morning. Christian Perrucci, Florio Perrucci, on behalf of Appellant 4431, Inc. We have restaurants in Bethlehem and Easton, and as your honors are aware, we're forced to shut our operations down in March of 2020. And the facts of this case are not indisputed at the time. And we're quite aware of them, so you can just move on. Thank you. Thank you very much, your honors. We appeal the District Judge Leeson granting Cincinnati Insurance's grant of dismissal, essentially arguing, your honors, that Appellant did not have physical loss pursuant to their business insurance policy, and therefore granting the dismissal. We feel that pursuant to the all-risk policy that my client had at the time, number one, there was no virus exclusion within this policy. There was a bacterial exclusion specifically. What was the bacterial exclusion? And help me understand why the breadth of the bacterial exclusion wouldn't include viruses. Yes, your honors. Specifically, many of these cases did have a virus exclusion, Judge McKee. We chose to not include a virus exclusion specifically in our business policy, and that's not denied by Cincinnati Insurance. Everyone admits that COVID-19 was a virus that killed, tragically, millions of Americans. You're saying you did have a microorganism exclusion? We did, Judge, yes. We had it. So there is a distinguish, in my opinion, between bacteria versus a virus exclusion. What's the difference? Specifically. Bacteria, yes. Is it a bacterial exclusion or a microorganism exclusion? There is both, Judge McKee. Why wouldn't a virus be? If it's not a microorganism, I don't know what the heck it is. Well, it's specifically, I think, identified by everyone as a virus. COVID-19 is known as a virus and not a bacteria or microorganism. And specifically, other insureds had this virus exclusion. We did not. And we would ask this honorable court to follow their precedent in Port Authority of New York and New Jersey versus affiliated 311F32262002, as well as the motorist mutual versus Harding, which found specifically that structural damage. We read the case, counsel. Your time is up. Thank you. Thank you very much, Your Honor. Okay. Mr. Dugan, I think. Yes, Your Honor. Thank you. May it please the court, my name is Daniel Dugan. I represent Topper Salon and Health Spa, who is seeking coverage for its normal operating expenses during the time it was shut down as a result of the state home orders issued by the governors in the states in which it operates. And Topper is unlike many of the other appellants here. I think it has some unique policy language. It has circumstances and arguments showing that it is entitled to coverage. Let me ask you a question. Isn't continuing business operations part of business income under the policy? It's a separate definition under business income, yes, Your Honor. Okay. But business income has two paragraphs to it. Loss of income and normal operating expenses. And in other parts of the policy, there are references to other types of expenses that provide coverage. So we believe that based on the loss, the physical loss of their premises, loss of use of their premises, that the coverage is triggered, and the coverage is triggered for normal operating expenses. We have not claimed any kind of loss of income. I have a question. If you read the policy in its entirety, what about the language dealing with restoration that deals with and helps define what is meant by loss of? That's clearly in the policy, Your Honor. Right. But it's not applicable in these circumstances. That's a situation where a coverage could be prematurely terminated as a result of the factors listed in the policy. That's not the case here. I'm not sure I understand what you mean. Doesn't the restoration language explain how far coverage will extend if there is a physical loss of the premises? No, Your Honor. What am I missing when I read the policy? The restoration of use provision talks about – You put a use in there. Because the policy doesn't talk about use. It talks about the premises of the property, doesn't it? Yes. But in this instance, there will never be a restoration of the property. Okay? In certain circumstances, you can trigger – That's their argument. That's exactly their argument. There won't be a restoration of the property. Well – Because you didn't lose the property. You lost the business which operates within the premises. And doesn't that give us a clue as to what the policy means? I don't think so, Your Honor. No. I think this policy is a badly written, very ambiguous policy. And that so long as we've proffered a reasonable interpretation of it, which I think we have, we're entitled to relief and coverage. I do have a question. Let's say there was no lockdown order. Yes. But the SPA's clients just decided it seems too dangerous. I'm just not going out. It's a spreader. So there was a loss of business for a year. Would there be – because the clients just all decided they're staying home, they're not going out, they don't want to get COVID. Would there be a physical loss or damage to the premises in that hypothetical? I couldn't argue that there would be a physical loss of use in that because it was based on individual decisions by the clientele. If everybody decided, hey, we're going to Planet Fitness and not Toppers, it happens. People make their decisions. That's a free decision that the clients and customers have made. It's not something that was imposed. They didn't have a choice. They couldn't go out and advertise. They couldn't compete. They couldn't argue. Okay. So that's not physical loss or damage. Why is it physical loss or damage when the reason the clients aren't coming is because the governor said they can't? Why does that make a difference? Because they were physically restrained. It's no different than a fire coming through, frankly. Okay? They were deprived of the physical use of their premises. It was a physical loss of use of the property. You keep putting use and physical together, which strikes me as a problem. It helps your argument. But the policy here doesn't go against loss of the business. It's loss of the premises. And, again, the entire language deals with restoration of the premises. It doesn't, Your Honor. It doesn't go to it. The language is physical loss of or damage to property. There's loss of. There's damage to. Those are distinct, separate concepts. And here there was a physical loss of the physical premises that they could not operate as a result of the constraints imposed on them by the governors. And that triggers coverage. Okay. Thank you, counsel. Thank you. Mr. Martin. Yes, thank you, Your Honors. Sure. James Martin. I have eight Pennsylvania insureds in these consolidated appeals. Let me start with the restoration language, if I could. The restoration of property language to begin with is not the coverage-determining portion of the policy. I agree with that. I agree with that. You only get there if there is coverage. Okay. So under the coverage-determining portion of the policy, there is no reason that the physical loss of the property can't come within that definition. And we have explained why Pennsylvania law would reasonably construe the property to do that. So then the argument comes up, well, wait a minute. What about repairs? If repairs are in there, then why can't we look to that? Well, first, the repair provisions are relevant contextually only if there is a need for repairs. They are not a separate coverage grant. The period of restoration describes only a time period during which loss of business income will be covered if repairs or rebuilding are required. But actual damage, excuse me, actual physical damage is not required under any coverage definition, as I said. And to read the repair definition as a limitation on coverage, and it's not a coverage provision, would conflict with Pennsylvania's principles of policy construction. It says specifically that the period of restoration is defined as the time it takes for the premises to be, quote, repaired, rebuilt, or replaced with reasonable speed and similar quality, or the date when the insurance business is resumed at a new permanent location, which would, made in context the entire policy, sure seems to look like the loss of the business premises is a physical loss and not loss of the use. So, Your Honor, let me break that down again. The coverage portion of the policy and the coverage grant provides only that the loss of use is covered and it's a risk covered under the policy. If we get that without actual damage and there's no need for repairs, coverage is appropriate. We only turn to repair and replacement if that's needed. And then that sets a time period within which the coverage is provided. Now, again, a Pennsylvania court would not read that as a clear and unmistakable limitation on the coverage in the first instance because it isn't. Turning, let's assume that you're right and you're covered and help me understand why the virus in your policies had a virus. They do, Your Honor. And let me start with the fact that the virus exclusion would apply here only if it clearly and unambiguously did by its terms. Again, that's Pennsylvania black letter law, the virus exclusion by its terms. It doesn't relate to closure orders and most specifically closure orders that are the product of a pandemic, a disease. And where you get the language. I'm sorry. You mean for me the clause, the virus exclusion clause that we're talking about? Yes. Yes. Now, looking at. Can you read that for me? Excuse me. There are a couple of clauses here. The virus exclusion language. So there are two virus exclusion clauses. One has language related to the virus. What is that language? It indicates that the virus. What does that mean? Oh, I'm sorry. What does it say? Yeah. I don't have it at my fingertips here, Your Honor. What about caused by? Yes. Or resulting from or relating to? Yes. Does that sound familiar? Yes. That's one of them. And then the other one, the ISO exclusion has the concurrent cause language in it. Now, let me start with the first one. The first one doesn't refer to closure orders. It doesn't refer to closure orders where there's a pandemic and they're the result of a pandemic. It applies only to the virus. And that would be present at the property. Now. Wait. Where does it say that? The virus present at the property is supposed to cause by resulting from relating to any virus, et cetera. So on that language, again, it doesn't specifically apply to this fact pattern. And it would be an issue of fact on caused by. But for that, let me also point out that the absence of the concurrent cause language in that virus exclusion would create an issue of fact. Because Pennsylvania law would allow. Who should they have drafted their virus exclusion if they clearly did not mean to exclude this situation assuming that there is coverage? What should they have said? They should have specifically related it to a virus that results from the spread of a pandemic disease. They didn't do that. And let me again focus on this. They didn't want to limit it to a pandemic disease. Well, if they wanted to extend it. I guess to go back and forth. If they wanted it to reach the pandemic disease, they needed to have that be specific. If they wanted it to reach the closure orders, they needed to have that be specific. Coming back to that provision again. Under Pennsylvania law, the absence of the concurrent cause language in that policy provision creates an issue of fact under Pennsylvania's concurrent cause law. We have this in our brief, Your Honor. Is this the efficient proximate cause argument? It is, Your Honor. And as to that clause, that creates a fact issue. On the ISO one, which has the anti-concurrent cause language in it, the fact issue arises by the application of the doctrine of regulatory estoppel under Sunbeam. Well, but if we look at what their submission was to the insurance office, it's pretty clear they were saying in there they weren't saying anything that would give rise to an estoppel. So, Your Honor, two things there. And that goes to Sunbeam directly. The first is that Sunbeam is looking at language submitted by the insurance industry that said this was a clarification and not a reduction of coverage. And frankly, Your Honor, that was a misrepresentation. This new provision was neither a clarification and it was most specifically a reduction in coverage because intangible losses had been covered for decades before that exclusion. The second thing is that this isn't about reliance as it relates to the regulators. Sunbeam says that. All that has to happen is a misrepresentation about the scope of coverage and the regulatory estoppel doctrine follows from there. And here I'm looking at the submission they made to the insurance office. And part of it says that they talk about an orthodox transmission of infection as a material raises the concern that insurers employing such policies may face claims in which there are efforts to expand coverage and to create sources of recovery from such losses contrary to policy intent. To me that seems very much like they're trying to not modify the policy but explain and clarify it. And that's my point, Your Honor. This provision as written was not a clarification of the existing coverage. It was very much a reduction in the existing coverage. And that's where the regulatory estoppel argument comes from. And I would point the Court to the amicus brief of the United Policyholders to follow through on that. The last point I'll make, Your Honors, is... Well, your time's up. Okay. Thank you, though. Thank you. Mr. O'Toole. May it please the Court, Brian O'Toole on behalf of Appellants, the Eye Care Center of New Jersey, and the Park Savoy Caterers, and the Park Chateau Caterers. The District Courts below erred by following the crowd instead of applying well-settled principles of New Jersey law to the contract language at issue here. Namely, policy exclusions are to be construed narrowly. Every word in a contract must be given its own meaning. Contract language is ambiguous if it is susceptible to more than one possible interpretation. An ambiguous language should be construed in favor of coverage. Properly applied, those principles require reversal here. While Appellants must acknowledge that the majority of recent COVID business interruption cases have been decided in favor of the insurance companies, it is not dispositive of our arguments for a number of reasons. First, the New Jersey Supreme Court has not yet spoken on these issues, and thus there is no binding decision compelling a specific result here. Second, this recent body of COVID case law is an echo chamber of sorts. I'm sorry, I didn't hear you. I'm sorry. You got a little fast, but I couldn't hear what you just said. But this recent body of case law is an echo chamber of sorts, with courts relying on many of the same decisions to reach the same result, with little to no analysis of critical variations in state law and contract language. And third, it is enough for Appellants' position that there has been some disagreement among courts in these recent COVID cases, because it shows there is more than one possible interpretation of the contract language at issue, and thus under New Jersey law, that language is ambiguous and should be construed in favor of coverage. As Judge Nygaard wrote in this court's opinion, in New Castle County v. National Union Fire Insurance Company, 243 F. 3rd 744, 2001, quote. You did that without looking at the notes. You memorized the citation for Judge Nygaard's opinion? I did. I think it's a good quote. Well, Dick will be very impressed. I'll have to tell him about this. I can't do that with any of my opinions. Me either. He wrote, quote, a single phrase which insurance companies have consistently refused to define, and that has generated literally hundreds of lawsuits with widely varying results, cannot under our application of common sense be termed unambiguous, close quote. Can I ask you a question about, you, in your brief, you point out there are a couple of cases that are on their way or at the Supreme Court of New Jersey, I guess MAC Properties and AC Ocean Walk. Has certification been granted in those cases? If so, when will argument be? And maybe you can give us an update on that. The petitions for certification are pending at this time, and as far as I'm aware, there's been no action on them. Okay. And we filed a motion to stay because of those petitions on July 26th. I guess I'm looking for an update. There's really no update. I don't have one.  Okay. No, that's fine. Okay. Thank you. You're welcome. At bottom, Your Honors, appellants here are arguing that they suffered covered losses because there was direct physical loss of use when they were physically unable to operate their businesses. But again, you're saying loss of use is supposed to loss of the premises, and you're acquainted with that. Yes, Your Honor. I believe the loss of premises occurred because the appellants were not able to use the businesses as they wanted to, and under the- They lost their business, basically. They lost their ability to use the space as they would like to. Let's say the insured was a restaurant, and because of the lockdown orders, they couldn't do any more dine-in eating, so they switched over to take-out and delivery. Was there a physical loss or harm to the premises? Yes, there would be, because they would not be able to use the space as they intended. They might be able to defray their- What if they made more money with the take-out business, using DoorDash and all these other services, than they did with the fancy indoor dining where you've got to pay servers and you've got the alcohol coverage and everything? If you make more money with the DoorDash and the take-out, you're still saying they could bring a claim? I believe there would still be a physical loss of use of the space. I don't know what the damages would be in that case. Okay, thank you. Thank you very much. And Mr. Andrews. May it please the Court, Walter Andrews on behalf of Boulevard Carol. I want to make at least three points, or try to make at least three points to show why my client, Boulevard Carol, is distinct from and different from these other parties. Not to say these other parties aren't entitled to the relief they seek, but I think it's important to understand the distinctions here. Who's your insurer? Fireman's Fund. It's the only Fireman's Fund policy in this matter. And that's important, first, because the policy provides an affirmative grant of communicable disease coverage. And therefore, under New Jersey law, the policyholder is entitled to that coverage and cannot have that coverage taken away. Can't give it in one hand, take it away in the other hand, and that creates otherwise an illusory coverage. And that's where the Court below, unfortunately, relied on a mortality exclusion, putting aside the fact we weren't claiming any mortalities. In the Marina Pacific case, the California public case that we submitted recently in a supplemental submission, Fireman's Fund, at oral argument, conceded that the mortality exclusion could not apply because of the affirmative grant of communicable disease coverage in their policy. I assume they would take the same position here. Second reason we are distinct from the other parties is that this is not an orders only case. There is no virus exclusion that sort of prompted people to seek orders. And again, not to say there can't be orders. In this case, there are, the judge got it wrong. They only looked at, I commend you to page 18 of our joint appendix to the complaint. And the Court looked at paragraph 23, which was an alternative pleading, where we sought coverage also for orders. Paragraphs 21 and 22, right before 23, make clear that alternatively we are seeking coverage for physical loss or damage to the property, not because of the orders. And the judge decided on her own to decide what that science meant, what those facts meant. And I think that's very important. And we also submitted the Baylor College of Medicine case recently to your honors. And in that case, the Court had allowed the case to go to trial. And the prior fact, after discovery and expert testimony, found that in fact COVID caused physical loss or damage, and awarded over $48 million in damages because of that. Is that the Texas case? Yes, sir, your honor. Let me understand why this language doesn't defeat your argument. This is from the Fervent Fund policy. We will not pay under property coverage, business income, extra expense coverage, or an extension or expense caused directly or indirectly, resulting from any of the following excluded causes of loss. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. One, regardless of how the cause of loss occurs, we will not pay for direct physical loss, damage, or expense, resulting from the following causes of loss. Mortality and disease. We're talking about loss caused directly or indirectly by disease. Well, again, I think the Fireman's Fund itself acknowledges that that cannot apply here. And that's why in the Marina Pacific case, it expressly withdrew any reliance on that exclusion in the face of the oral argument. And the reason is, just as I said, under New Jersey law, it would be illusory coverage for there to be an affirmative grant of virus coverage, which there was in this policy, communicable disease coverage, which includes a virus, and then an exclusion taking it away. And New Jersey has been very clear that that would be misleading and would provide confusion and be illusory in the sense of what the policyholders should reasonably expect. If you're going to grant affirmative coverage, you can't then take it away. And unlike all the other policies here, there was an affirmative grant in the Fireman's Fund policy of communicable disease coverage, which would, in fact, include the COVID-19 virus. You could have a situation where there was communicable disease that resulted in damage to the business without this kind of situation, where the business was shut down because the disease boomed into a pandemic. Someone goes in and they catch some disease, which they can trace back to food they ate or something they caught from the waiter. It would seem to me that grant of coverage would apply in that case, but yet wouldn't apply in this case. Am I wrong about that? I think that, Your Honor, is a question of fact that should go to a jury as to the quantum and existence of physical loss or damage. The problem we have here is this complaint was filed over two years ago, back when science was very unclear. Dr. Fauci even got it wrong, and at the time, the judge decided what that science would show. The Baylor case from Texas shows that, in fact, if you're allowed to present the evidence, take discovery, put in expert testimony. We've learned a lot in these two years, and at least there, a jury was convinced that, in fact, there was damage or loss to the property itself, regardless of the orders. And the injustice is there's a policyholder that got to go to trial and show a jury that evidence. We haven't been given that chance. If you look at paragraphs 21 and 22 of our complaint, that's exactly what we allege. And at the motion that's in this stage, we should have been given deference to those facts and given a chance to take discovery and prove those facts. Thank you, counsel. Good morning, Your Honors. Dave Roth, a Wigan and Dana for Hartford Casualty and Twin City Fire. They're the defendants in five of these cases. I'm also going to be speaking on behalf of the insurers in the other nine cases. District Court's decisions dismissing these cases should be affirmed for two reasons. First, all the coverage provisions that are at issue here require the policyholders to allege that they suffered a direct physical loss of their property. They didn't because their temporary inability to use property due to government orders issued in response to COVID-19 is not a physical loss of the property itself. Second, these policies contain virus exclusions and other exclusions that unambiguously bar coverage for these losses. I'd like to focus most of my time on the direct physical loss issue. As I said, all the coverages that are at issue here require the policyholders to show a direct physical loss to their property. All of them with the exception of the court authority case, which doesn't have fireable asbestos situation, which does not result in actual physical loss, but possibly the potential for loss of use of the property because of the fireable asbestos. So those cases have been considered by a great number of courts in the recent years addressing this situation. And what they've noted is the key to that court authority case is that there's contamination of the property with a dangerous substance. There's asbestos in it. And that asbestos contamination, until it's remediated, it makes the property unusable and uninhabitable. And we don't have either of those things here, except for Boulevard Carroll, which now argues something about virus being on site. I'll get to that in a second. They're all relying solely on government orders. They're not claiming the virus was on their premises. They're not claiming that it physically damaged it in some way. And they're also not claiming that the virus made their property unusable and uninhabitable. So as court after court has recognized, the court authority case doesn't provide coverage for losses of use of the property due to government regulations. In the last year, there's more than 100 federal and state appellate courts that have considered this exact argument, that the loss of use of property due to government regulations enacted in response to COVID-19 is a direct physical loss. Every federal circuit, every numbered federal circuit except for this one, has rejected that argument, many under the laws of multiple states. Six Supreme Courts have done so. The Intermediate Appellate Courts of 10 more have, including New Jersey, which governs some of these appeals, and Pennsylvania's neighbors in New York, Ohio. Could you move to, you said you were going to talk later about, I'd be interested now, what if the virus actually inhabited the business premises? You said you were going to deal with that. Sure. So Boulevard Carroll is the only one that argues that there actually was some kind of virus on site in that brief. And they've got two problems with that. The first is it's a theory in search of a complaint. They didn't allege that below. They were very explicit about what the cause of their loss was in their complaint. They said they suffered substantial loss of business income and related expenses resulting from the closure orders issued in New York, New Jersey, and Maryland. That's paragraph 13. Nothing in the complaint talks about the virus being present there. Nothing in the complaint talks about it being contaminating the property and damaging it. They didn't ask to amend that below. They entirely argued that their loss was due to closure orders. So they forfeited this theory a long time ago. The court doesn't need to consider it. Even if you were to consider it, though, this is a case that, by their own telling, is subject to New Jersey law. New Jersey addressed that exact theory in the Oceanwalk case, holding that the presence of the virus on your property doesn't amount to direct physical loss, doesn't tangibly alter property in the way that you would describe as physical damage. It can be wiped away with simple disinfectants. It becomes inert and harmless on its own. It's not a physical alteration of the property. And it doesn't make the property unusable and uninhabitable. We know that because, you know, even in the immediate aftermath of the pandemic, grocery stores, liquor stores were open. There was clearly virus in those establishments. It didn't make those properties uninhabitable. We all went into them in the months since the closure orders have lifted. The virus has continued to be a part of our daily life. It's in establishments all over the place, and it hasn't made any of those establishments uninhabitable. So the claim that the virus itself made their property unusable and uninhabitable just isn't viable under New Jersey law. Are there any circumstances where a virus or germ could result in physical loss? There likely are circumstances where a virus could cause physical loss. You might have a policy that ensures livestock, for example, or pets in a pet store. And they could get sick and die, and that may be property damage. So the question really isn't whether a virus could possibly cause direct physical loss. It's whether this virus caused direct physical loss in the circumstances that these policyholders allege. And all they're alleging here is that the government orders, which, as Your Honor was pointing out, they're really just causing an economic loss. They aren't causing a physical deprivation of the property. They're not taking the property from the policyholders. They still have it. That's not a physical loss. Just because you've got some time, you know, I wonder, you said none of these cases have that. That's fine. How are these claims investigated before coverage is denied? I mean, do the insurance companies just straight out, if it's sort of looking like this circumstance, they straight out deny it? Well, it depends a little bit on what the insured represents. Because I know there are other cases out there as well. I'm just curious about do they investigate these things before they deny coverage? I understand that they do, but it also depends on the circumstances. That was a big stamp that this is denied. I do not think it's a deny, deny, deny. Obviously, if the policyholder comes forward with specific claims about, you know, how COVID affected them that are something other than just the government orders impacted us, then I expect most of the insurance companies would investigate that. I can't speak to the circumstances of any of these cases because that's not present in any of these cases. Okay. I do want to address a couple other points we heard. We heard a suggestion from some of the policyholders that the split of authority alone creates ambiguity. That's something that courts have rejected time and again. It's the Lower Paxton Township case from Pennsylvania talks about that. I think Mr. O'Toole talked about New Jersey law specifically. That's true, but there's also no split in New Jersey law. New Jersey has already addressed these exact claims and said that they fail as a matter of law under New Jersey law. So there's really no ambiguity as to what the law is in New Jersey. Why isn't the Farmers Fund policy different? So there were a couple of arguments we heard about why it's different. One, there was a reference to a special coverage extension in that policy for communicable disease events. The problem with that is that Boulevard Carol concedes three times in its brief, I believe, that that coverage does not apply here because of how communicable disease event coverage is defined. So it's essentially dealing with situations where the health authorities order you to close and quarantine and decontaminate your property, which didn't happen. So they recognize that that special coverage extension doesn't apply. There's no direct physical loss in that policy for the same reason there isn't under all the other policies that policy provision that doesn't govern these circumstances really doesn't matter at all. That policy also has a virus exclusion like the other policies. I think there's a little confusion about which of the exclusions there are in these cases and what they say. It was not specifically the virus exclusion, I don't think. Yeah. So hopefully I can try to clear up some of that confusion a little bit because there's a few different exclusions at issue here. So there's the ISO exclusion, which is found in five of these policies. And that's the one that says loss or damage caused by or resulting from any virus, bacterium, or other microorganism. We heard two arguments about why that doesn't apply. We heard an efficient proximate cause and a regulatory estoppel argument. On efficient proximate cause, that argument's been rejected time and again. It's been rejected in New Jersey by the Mack property case, so we know that that fails in New Jersey. It's been rejected in several other circuits, including Mashallah from the Seventh Circuit and Mud Pie case from the Ninth Circuit. And what those cases have recognized is that under the efficient proximate cause doctrine, you look at what the predominant cause of the loss is. And the predominant cause of government orders issued to stop the spread of a virus is the virus. That's why those orders were issued. It's the only cause of the loss. So the efficient proximate cause doctrine isn't a bar to the ISO exclusion applying. We also heard a regulatory estoppel argument. Regulatory estoppel is a form of... So in that instance, as the plaintiffs argue, the government shutdown was not the efficient proximate cause? That's their contention, yes. But we would say it is, because that's the predominant cause of why the government orders were issued. So the loss that flows from the government orders... No, the virus is the proximate cause of that entire chain of events, and so it's the proximate cause of their loss. And that's what Mack property says. It's what several other decisions have said. On regulatory estoppel, as the Pennsylvania Supreme Court explained in Sunbeam, this is a form of judicial estoppel. What it prevents is an insurer from saying, this language we're seeking approval of means X when they're seeking approval of it, and then turning around in litigation and saying, actually, it means something different. And then regulatory estoppel may bind the insurer to the representations it made when it was seeking regulatory approval. The problem here is there's no change of position. ISO said when it promulgated the ISO exclusion, this will bar coverage from losses caused by a virus. It's saying the exact same thing now. This court in the Hussey-Copper case recognized that regulatory estoppel doesn't apply unless there's been a change of position. Under Pennsylvania law, Mack property under New Jersey law said the exact same thing. Since there's been no change of position here, regulatory estoppel is irrelevant. Selective has an exclusion in the Park Savoy and Caterers case. It's similar to the ISO exclusion, except it's a little broader in that it also applies to loss caused by resulting from or relating to a virus. And under New Jersey law, that relates to phrase is not causal. Is there any effective difference between those two definitions? One is loss is caused by resulting from, and the other is caused by resulting from or relating to. Is there any effective difference between those two? There is. So the relating to is not a causal term. Under New Jersey law, it doesn't require a causal relationship at all. It's the Norman International case that Selective cited in its 28J letter. So the efficient proximate cause doctrine just doesn't apply to that exclusion. But even if it did, that's a New Jersey case, and Mack property already said the virus is the efficient proximate cause of these losses. Another exclusion is the one that's in my client's policies, the Hartford and Twin Cities policies. And that's the exclusion. It's in five of these cases. It says loss or damage caused directly or indirectly by the presence, growth, proliferation, spread, or any activity of fungi, wet rot, dry rot, bacteria, or virus. Now, that exclusion has what's called anti-concurrent cause language. It says it applies regardless of whether there are other causes. Everybody agrees that that anti-concurrent cause language applies and is effective in both New Jersey and Pennsylvania. So the efficient proximate cause doctrine is irrelevant to the Hartford-Twin City exclusion. Also, the regulatory estoppel argument is irrelevant to that exclusion. It's irrelevant, for one, because the policyholders, only two of them in the Hartford-Twin Cities cases even raised regulatory estoppel below. And then in their opening brief, none of them argued that regulatory estoppel applied to Hartford-Twin Cities. Go ahead. I do want to switch gears for a second from merits to jurisdiction. It appears that in a number of the cases, citizenship wasn't alleged, and I'm not sure that we have diversity. I don't know if that's an issue that you've looked at. I can say that it, as I said, the Hartford-Twin Cities policies, or cases, I am confident that there was jurisdiction. I believe one of those cases was removed. There's never been a dispute about jurisdiction as to those cases. I'm not aware of any facts that have been brought to the attention of the court that would suggest that the plaintiffs in those cases are not diverse from the insurers. In those cases? In those five cases, yeah. I guess I can't say for sure about the other cases. I have not been aware of any sort of issue with them. One more point on the Hartford exclusion with the regulatory estoppel point. There was an argument made in the reply brief from the one cent brief that regulatory estoppel does apply to Hartford and Twin Cities. Obviously, I contend that was forfeited. But even if you were to consider it, regulatory estoppel doesn't apply there because the alleged misrepresentations are misrepresentations that ISO supposedly made about its exclusion. Hartford exclusion is a completely different exclusion. It was enacted through a different process. This court already said in Hussy-Copper that regulatory estoppel isn't going to bind different parties who have different contractual terms. The Lloyds policy has a microorganism exclusion. That's the same exclusion that the Seventh Circuit found applicable in the Crescent Plaza case. I think it applies here for the exact same reason Crescent Plaza held that it did. The Fireman's Fund exclusion, as Your Honor was pointing out, it says that there is no coverage for loss, damage, expense caused directly or indirectly by a series of excluded causes of loss. And one of them is virus. So as the district court found, the losses here are caused by the virus, that exclusion applies. There's also an ordinance or law. So with respect to this Lloyds exclusion, virus would fall under microorganism? Yes, it would. And it's not just microorganism itself, but the exclusion then says fungus spores or microorganism of any type, nature or description, including but not limited to any substance whose presence poses an actual or potential threat to human health. So as Crescent Plaza said, that's an extremely broad definition. It indicates that any substance that could possibly be understood as a microorganism is covered. Clearly viruses are very commonly understood as microorganisms. What about the argument that under the Fireman's Fund's policy anyhow that we get into a situation where the coverage is illusory, that you give coverage with one hand and then you take it away with the exclusion? So there's a special grant of coverage, that communicable disease event coverage. If that coverage were to apply, Fireman's Fund would not contend that the virus exclusion takes it away. But as Boulevard Carroll concedes in his brief, that coverage doesn't apply. So the exclusion remains operative for the base policy coverage. And it bars these losses here. There's also the ordinance or law exclusion that's in the admiral policy. The district court relied on that in part to dismiss. We can rest on our briefs for that. Your Honor, I also had a question about the status of some of the state cases. So there's pending petitions before the New Jersey Supreme Court. They haven't been acted on. Petitions weren't actually filed in all the cases. Petitions raise some different issues. There's some different exclusions in some of those cases. So we don't know when the New Jersey Supreme Court will ever even get to those petitions. We don't know what issues it will take up. And of course, if it were to take them up, we would suggest that the New Jersey Supreme Court is likely to do the same thing every other state and federal court has done in the country. So you're arguing there's no need to grant a stay here? There's just no need to grant a stay. And further delay of these cases is a real problem, Your Honor. The oldest case here, the Wilson case, that's a district court decision that will turn two years old on Friday. Sustaining these cases for potentially years more for further litigation in the state courts is unreasonable. And remember, we're not just talking about these 14 cases under the consolidation order. Every appeal that's been filed in a circuit that raises similar issues is automatically stayed until these appeals are resolved. Do you have any idea of the numbers, just out of curiosity? There's about 40 that are subject to that stay order, but there's actually more cases than that, because the courts in the circuit stopped issuing dispositive decisions because they knew if they did, there'd be an appeal and it'd just be stayed. So there's probably like 100 cases in the district courts that probably would have been resolved by now, but for the stay. So putting these 14 cases on hold effectively stays somewhere like 150 cases, regardless of what the parties in those cases think about it. Which of the cases on the other side, I understand there's fewer of them, which one gives you the most impact? Which one gives you the most heartburn, and why shouldn't we worry about it? Is it Baylor? Of the cases, okay. Honestly, Your Honor, none of them give me heartburn. I'm not surprised by that answer. So there's two fundamental differences between those cases and these cases. One, all of them are state cases decided under state pleading standards, and every single one of those decisions that comes out the other way notes that the pleading standards are determinative. For example, the Marina Pacific case, it explicitly contrasts California's DMER standard with the federal standard. It says that common sense is not something judges consider when they're resolving a motion for a DMER in California. It's not even something we have. That is something that federal courts have to consider under ICBAL, and that's why every federal court that's considered similar allegations has found no coverage, even when there's allegations of virus on site. The second big difference with all those cases is that the plaintiffs in those cases provided detailed allegations about how the virus supposedly was present on their property, how it damaged their property. So in the Marina Pacific case, for example, the policyholder alleged that sheets and towels and things of its hotel were contaminated with the virus and had to be discarded. And under the deferential pleading standard they use in California, the California Court of Appeals thought that was enough. Now, even in California there's a disagreement about that, because there's another case, the United Talent Agency case, that came out the other way. But ultimately that's really a dispute about California pleading standards, really a dispute about a different series of allegations than we have here. So it really doesn't change the outcome. Although the Wakeburn case does seem to be driven really by common sense. The court's saying that this stuff is so incredibly technical, you may be right, it may not have been an actual loss, the grid may not have actually been physically broken, but no one's going to understand that, basically unless they're an electrical engineer. And therefore, looking at the reasonable intent of the insurer, we're going to say that there was coverage under the policy. It just seems to be common sense driven. But it was a physical event that was programmed into the grid itself. So it wasn't really broken. Well, it was broken in the sense that it could not physically transmit power. If they went and flipped the switch, no power would flow, no power could flow. And right after the court says that, it has footnote seven where it says, we would reach a different result if the grid were still capable of functioning, but the government said you should shut down the grid. MAC property, AC Oceanwalk relied on that language. It explained why Wakeburn doesn't apply here. We think those decisions are correct and they dictate the outcome as to New Jersey. If you have any other questions, I'm happy to address them, otherwise we'll rest on our briefs. Thank you, counsel. Thank you. I've got one minute, your honors. Three points, if I can. First, on the doctrine of regulatory estoppel, a change in position is not required. It is not analogous to judicial estoppel under Pennsylvania law. I'd point the court to our briefing on that and the United Policyholders' brief. On efficient proximate cause, as to the policy without the anti-concurrent law cause language, Pennsylvania's efficient proximate cause doctrine would create a fact issue on that. Third, the ability to use the property for some purpose is not the proper inquiry under this coverage. It's the property, the functionality of the property as it's intended to be used, meaning as a going concern business. That's what was examined in Port Authority, Hardinger, Hetrick, Gregory Packing, Oregon Shakespeare Festival. The use of the property as intended. What about my hypothetical with the dine-in versus the takeout and delivery? They're still selling food to customers who want food. But, your honor, under the policy, it is as the business operated as intended. That's the way the premiums are set and that's the way they're written. If you look at it from the standpoint of physical harm, that's not required either. That's added language that the insurers are putting in the policy. Oil spills, bacteria, asbestos, gas vapors all harm people. That's the essence of the coverage argument here. The imminent threat of harm is what makes the property unfit for its intended use. That's the reason the closure orders exist and that harm persists and is present and that's why there's coverage in these cases. But intended business purpose isn't in any of these policies, is it? No, but it's the way the functionality inquiry is analyzed. The property is insured, your honors, under the all-risk coverage for business interruption as a going concern. It's implicit in the breadth of the coverage. The coverage is not as applicable to any risk that arises, absent a specific exclusion that takes it away, and we don't have that here. So Pennsylvania very much would bring the reasonable construction of coverage here as our brief outlines, and if there's a debate about that, your honors, I would submit we can leave it to the Pennsylvania Supreme Court to decide to get it right. Thank you. And finally, Mr. Andrews. Thank you for the brief points. I think Mr. Ross conceded my point on the fact inquiry when asked about whether wiping up the virus would eliminate any issue. That is a classic fact question. It goes to Judge McKee's question about repairs. Well, yes, we did repairs. Plexiglass was put in. We had filtration systems. You have sanitizing. You have separation of people's workspaces. But those are all fact questions as to how much of the loss or damage occurred, how long it will last, what it's worth. And it goes directly to the equal point on terms of pleading. Why Baylor bothers him the most is because we now know that the pleading is plausible. That pleading actual loss or damage caused by COVID is plausible because we have a jury verdict that found that. And I think Mr. Ross misspoke when he said our complaint did not allege that. Paragraph 22 at joint appendix 18 explicitly states that request a declaratory judgment because the policy provides coverage to plaintiff for business income, losses, and associated expenses. Which paragraph is that? I'm sorry. Paragraph 22 of the complaint, joint appendix 18. Expenses caused by the suspension of plaintiff's business operations due to direct physical loss and damage to plaintiff's business locations caused by COVID-19. Couldn't be clearer. Claim is for direct physical loss and damage to the property caused by COVID. If there was an issue that needed an amendment, then they could have done that. And then on the mortality exclusion, there's a little shell game going on here. And that's, again, in Marina Pacific, exact same policy, same exclusion. And in fact, yes, fireman's fund could rely on the mortality exclusion for another disease. But not for a communicable disease that is being affirmatively granted as a coverage to Boulevard Carol. New Jersey law is clear, you can't affirmatively grant coverage and then take it away because it creates an illusory coverage. Again, there may be other diseases, noncommunicable diseases, that a mortality exclusion could apply to. It can't apply to this one. And going back, finally, on the fact question as to the extent of physical loss or damage. This court's already ruled on this. In Port Authority, under New Jersey law, the question is the amount of loss of functionality is a question of fact. In that case, there wasn't a loss, a complete loss of functionality. But the Third Circuit has stated that under New Jersey law, if there is a loss of functionality, then there is coverage. And fireman's fund conceded that in their brief, that that's the standard. And that should be the fact question that should go to the jury. Did Boulevard Carol lose functionality of its space because of the direct physical loss and damage to its business caused by COVID-19? Okay. Thank you. Thank you, Your Honor. All right. Thank you, counsel. We'd like to thank counsel for their excellent briefing in this case and oral argument today.